2001 ME 57

**Robert SPRINGBORN et al.**

v.

**TOWN OF FALMOUTH et al.**

Supreme Judicial Court of Maine.

Argued March 8, 2001.

Decided April 9, 2001.

John C. Bannon, Esq., (orally), Timothy H. Boulette, Esq., Murray Plumb & Murray, Portland, for plaintiffs.

Catherine R. Connors, Esq., (orally), Helen L. Edmonds, Esq., Portland, (for Fairway Villas, Inc.), and Amy K. Tchao, Esq., (orally), Drummond woodsum & MacMahon, Portland, (for Town of Falmouth), for defendants.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Robert and Wendy Springborn appeal the judgment of the Superior Court (Cumberland County, *Mills, J.*) affirming the decision of the Falmouth Planning Board granting final subdivision approval to Phase I of the Fairway Villas residential subdivision. On appeal, the Springborns claim that Phase I of the Fairway Villas subdivision violates the Town of Falmouth's zoning ordinances concerning mixed use developments and dead end streets. Because the Planning Board did not err in determining that Fairway Villas

is a mixed use development, and that its street configuration is not subject to dead end street length limitations, we affirm.

## I. FACTUAL BACKGROUND

[¶ 2] This case involves development of the Woodlands subdivision and the Fairway Villas subdivision on a large plot of land in Falmouth that was originally owned or controlled by related corporate entities. Robert and Wendy Springborn own a residence in "The Woodlands," a subdivision consisting of ninety-five residential house lots, a private roadway system, and a private golf club. The land developed for the golf club extends into the area of the Fairway Villas subdivision. The Fairway Villas subdivision would place approximately sixty-eight residential units adjacent to the southern boundary of The Woodlands. Phase I involves the construction of twenty-four of these units. The Springborns' lot would directly abut Phase II, planned for future development.

[¶ 3] Fairway Villas, Inc., the developer in the present case, was created by the merger of Golf Development Corporation and Fairway Villas, Inc. The Woodlands subdivision was developed by Golf Development Corporation. Fairway–GDC was also formerly known as "The Woodlands Corporation."

[¶ 4] In 1989, after The Woodlands had been constructed in the northern portion of the original parcel, The Woodlands Corporation applied to have the zoning status of the vacant southern portion, known as "the Commercial Zone," changed to "mixed use." The Town granted the request. Fairway then applied to obtain the necessary approvals for the proposed subdivision under the Town's two separate ordinances, the Land Subdivision Ordinance and the Zoning and Site Plan Review Ordinance. In 1994, Fairway received preliminary subdivision approval for a sixty-eight-unit subdivision to be constructed in the mixed use zone.

[¶ 5] Some homeowners in The Woodlands then sought, unsuccessfully, to prevent GDC from using the roadway system within The Woodlands, which had been conveyed to the Woodlands Homeowners Association, to access and develop the Fairway Villas subdivision.[1] Fairway subsequently reapplied for preliminary subdivision approval for the project, having failed to timely act on the first approval. After several meetings and hearings, Fairway divided the development into two phases, Phase I containing twenty-eight units on the west side, and Phase II containing forty units on the east side.[2] The Springborns opposed the preliminary approval on the grounds of noncompliance with applicable ordinances, noise, and adverse effects on wildlife.

[¶ 6] In 1999, Fairway once again received preliminary subdivision approval for sixty-eight units, and subsequently, site plan and final subdivision approval for Phase I. As finally approved, Phase I con-

---

1. *See Alexander v. Fairway Villas, Inc.*, 1998 ME 226, ¶ 16, 719 A.2d 103, 107 (finding that GDC had specifically reserved the right to use The Woodlands' streets to access and develop the Commercial Zone).

2. Phasing is permitted under section 7(E)(1) of the subdivision ordinance, entitled "Final Plan Procedures," which states in part:

   If approved by the Planning Board, the developer may present a section of the Pre-

liminary Plan for approval, provided such section contains at least 25% of the total number of lots as shown on the Preliminary Plan. The remainder of the Preliminary Plan, as approved by the Board, shall not be altered in any way without further review and approval by the Board.

Falmouth, Me., Land Subdivision Ordinance § 7(E)(1) (1997).

sists of twenty-four residential units, including five individual house lots and nineteen condominium units housed in twelve buildings, with one or two units in each. The Springborns appealed the Planning Board's decision, pursuant to M.R. Civ. P. 80B and Falmouth Land Subdivision Ordinance § 18,[3] claiming that the Board erred in finding that Phase I was a mixed use development under the Zoning and Site Plan Review Ordinance, and in failing to find that it violated Appendix 5, section E(5)(c) of the Land Subdivision Ordinance, which limits the length of dead end streets to 1500 feet.

[¶ 7] The Superior Court affirmed, finding that the Board's determinations that Phase I is a mixed use development and that the dead end street ordinance was satisfied were "supported by competent evidence in the record." The Springborns then brought the present appeal.

## II. MIXED USE DETERMINATION

[¶ 8] When the Superior Court has acted as an intermediate appellate court, "we directly review the operative decision of the municipality, which in this case is the Board." *Forbes v. Town of Southwest Harbor*, 2001 ME 9, ¶ 6, 763 A.2d 1183, 1186 (citing *Stewart v. Town of Sedgwick*, 2000 ME 157, 757 A.2d 773, 775). The Board's decision is reviewed "for an abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." *Id.* (citation omitted). In addition, the interpretation of a zoning ordinance "presents us with a question of law which we review de novo." *Marton v. Town of Ogunquit*, 2000 ME

166, ¶ 6, 759 A.2d 704, 705 (citing *Banks v. Maine RSA # 1*, 1998 ME 272, ¶ 4, 721 A.2d 655, 657 (1998)). The ordinance is interpreted "by examining the plain meaning of the language," and "the terms are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Id.* (citation omitted).

[¶ 9] The Springborns assert that the Board erred in determining that the Fairway Villas subdivision is a "mixed use development" pursuant to the Town's Zoning and Site Plan Ordinance. Section 3.8 of the ordinance states that the residential uses permitted in the mixed use zone, aside from single-family detached dwellings, are "residential planned developments as part of mixed use development." Falmouth, Me., Zoning and Site Plan Ordinance § 3.8 (1998). A "mixed use development" is defined by the ordinance as a "planned, integrated development involving two or more different uses including, but not limited to, office, residential, light manufacturing, and retail, in an architecturally harmonious environment with common access and utility systems." *Id.* § 2.94. The Springborns contend that Fairway Villas has only a single residential use, and that the Board erred by allowing the subdivision to borrow recreational uses belonging to The Woodlands in order to qualify as a mixed use development.

[¶ 10] The ordinance specifies only that the development "involve" two or more uses. The language does not require the uses to be contained wholly within the proposed project, nor does it prohibit the incorporation of a use from an existing,

---

**3.** Section 18 states:

Appeals from decisions rendered by the Planning Board under this Ordinance shall be taken directly to Superior Court in accordance with Rule 80B of the Maine Rules of Civil Procedure and no appeal shall lie from decisions of the Planning Board to the Board of Zoning Appeals or to the Falmouth Town Council.

Falmouth, Me., Land Subdivision Ordinance § 18 (1997).

related development. The developer of the Fairway Villas subdivision is the same entity that developed The Woodlands, having reserved the right to develop the southern portion of the original parcel, and the subdivisions are related by design, with the golf course extending into one from the other. Under a reasonable construction of the ordinance, the Fairway Villas subdivision involves two or more different uses—residential units and the golf course.

[¶ 11] The evidence also supports the Board's factual determination. *See Goldman v. Town of Lovell*, 592 A.2d 165, 168 (Me.1991) (stating "whether or not the proposed structure or use meets the definition in the application thereof may be a matter of fact ...") (citation omitted). Fairway Villas residents have the right to become members of The Woodlands Club, with full use of all its recreational facilities, including its golf course. Nonmember residents are also entitled to use the area of the golf course and pond, both above and below the mixed use zone, for recreational purposes not interfering with golfing. Consequently, the Board did not err in determining that, pursuant to the ordinance, Phase I of the subdivision is a mixed use development.

### III. DEAD END STREET LIMITATION

■ [¶ 12] Phase I of the Fairway Villas subdivision will use the existing streets within The Woodlands, without modification. No new streets will be added. The Springborns claim that the street configuration constitutes a dead end street which exceeds the 1500–foot length limitation set forth in the Town's subdivision ordinance. *See* Falmouth, Me., Land Subdivision Ordinance, App. 5, § E(5)(c) (1997).[4] The streets form two circular drives, connected by a length of roadway in between, with cul-de-sacs branching off the configuration at various points. In addition to a single entrance to the subdivision, two emergency access roads lead from the main roads outside the subdivision to the streets within The Woodlands, one on the east side, and the other in the northwest corner. The emergency access roads are gated and locked, but the Town has possession of the keys and plows the access areas in the winter in the event an emergency vehicle needs to gain access.

[¶ 13] Section E(5)(c) of the subdivision ordinance requires a dead end street to be measured from the "centerline of feeder street" to the "center of turnaround." It also addresses "those cases where on or off-site street configurations create an effective dead end condition," stating that the measurement in that situation must be made from "the point where only one means of access exists" to "the point of turnaround." *Id.* The term "dead end" itself is not defined in the ordinance. The Springborns contend that the distance measured from the regular access entrance to the cul-de-sacs located at the furthest points of the circular drives exceeds the 1500—foot limit. Review of the record indicates that even if the street were measured from the point at which Woodlands Drive intersects with itself to the furthest point of its larger western loop, this length of roadway would be in excess of 1500 feet.

---

4. Appendix 5, section E(5)(c) states:
   Maximum length of Dead End Street: 1500 feet measured from the centerline of feeder street to center of turnaround. In those cases where on or off-site street configura-

tions create an effective dead end condition, the dead end length is measured from the point where only one means of access exists and extends over the intervening roadway length(s) to the point of turnaround.

[¶ 14] However, the streets do not constitute an effective dead end condition as addressed in the subdivision ordinance. The streets do not have a single "point of turnaround"; instead, they circle around, without a definite terminus. This looping design allows each individual lot to be approached from two directions such that the configuration does not create a "dead end" condition under section E(5)(c). *See Richert v. City of South Portland,* 1999 ME 179, ¶ 7, 740 A.2d 1000, 1002 (stating "[e]ach undefined term is given its common and generally accepted meaning unless the context of the statute clearly indicates otherwise") (citation omitted). The Board's decision is consistent with the purpose of the ordinance to protect public safety by assuring multiple means of access to any property more than 1500 feet from an intersection. Thus, the Board did not err in determining that the streets to be used by the Fairway Villas subdivision complied with dead end street limitations in the Town's ordinances.

The entry is:

Judgment affirmed.