STATE OF MAINE
LINCOLN, ss.

RECEIVED AND FILED
LINCOLN COUNTY SUPERIOR COURT

JAN 0 4 200

SHARON SIMPSON
CLERK

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-99-004

DANA and RUTH GAGNE, et als.,[1]
      Plaintiffs

v.

TOWN OF DRESDEN, et als.,[2]
      Defendants

)
)
)
)
)
)
)
)

**DECISION AND ORDER**

Pending before the court is the plaintiffs' Motion for Leave to File a Second Supplemental Complaint and their Rule 80B Appeal. For the following reasons the motion for leave is denied, the Planning Board's decision is affirmed, and the Board of Selectmen's decision is affirmed.

## BACKGROUND

Joseph Arsenault owns a parcel of land located on Route 27 in the town of Dresden, Maine. His parcel, and the parcels of all the plaintiffs, except Blackwell and Adams, is within the "General Use" District.[3] Moreover, the General Use District along Route 27 is one of three areas designated in the Town of Dresden

---

1. The additional plaintiffs are: Patricia Gray, Alton Worth, Richard Main, George Rudge, Regan and Jolene McPhetres, Anthony and Gloria Dawn Pallis, Carol Adams, and Jeffrey and Lori Blackwell. The plaintiffs will be collectively referred to as "the plaintiffs."

2. The additional defendants are the Town of Dresden Planning Board, Town of Dresden Board of Appeals (collectively referred to as the "municipal defendants" or "the town"), Joseph and Elizabeth Arsenault, Adam Johns, Scott Connors, Joan Jordan, and Arsenault Associates d/b/a Dresden Motocross Raceway (collectively referred to as the "non-municipal defendants").

3. "The General Use Districts are those areas of the Town that are the most environmentally suitable and practical to accommodate future growth and development within the community. The General Use Districts are intended for a mix of residential and non-residential uses that are compatible with existing surrounding uses and natural resources and are along established roadways." DRESDEN, ME., LAND USE AND DEVELOPMENT ORDINANCE, Article V, § 2 (A)(2).

Comprehensive Plan[4] as "Community Living" areas.[5] On August 18, 1998, the non-municipal defendants

---

4. "The Dresden Comprehensive Plan serves as a guide for managing the changes in the Town and its surrounding environment that are anticipated over the next ten years (by the year 2001)." 1 DRESDEN, ME. COMPREHENSIVE PLAN, 1 (1991).

5. "Community Living" areas have been deemed by the town to be the most suitable areas to accommodate and focus the majority of the town's projected growth. 1 DRESDEN, ME. COMPREHENSIVE PLAN, 11 (1991). "Community Living areas would accommodate the majority of the projected 140 new dwelling units and other nonresidential uses over the next 10 years. Historically, these areas have accommodated a mix of residential and nonresidential uses along established roadways. The focus of this Plan is to continue in this fashion, provided that new uses are compatible with the surrounding land uses and natural resources." Id.

filed an application with the Dresden Planning Board ("Board") for a conditional use permit to build and operate a motocross raceway (for motor bikes with engines up to 250cc) and related access, parking, and spectator facilities on a portion of the Arsenault property.

After several public meetings, and a public hearing, the Board voted on February 16, 1999 that the non-municipal defendants' application, as amended, was complete pursuant to the Land Use and Development Ordinance. It also voted that the non-municipal defendants' project should be deemed a "major development" under the Ordinance.[6] Subsequently, after several additional meetings and a public hearing on the amended application, the Board unanimously voted on April 20, 1999 to approve the project with conditions, and issued the Conditional Use Permit on May 6, 1999.

According to the plaintiffs, the noise, dust, fumes, traffic, and other external effects of the operation of the motocross racetrack will directly and adversely affect the value and use of their property for residential purposes, and the Gagne property as a residential mobile home park. Consequently, on May 18, 1999, the plaintiffs brought this 80B Appeal asking the court to vacate the Board's decision granting the non-municipal defendants a permit to build a motocross speedway near their homes (Count I).[7] Subsequently, on July 9, 1999, the plaintiffs filed a Supplemental Complaint in which they added a count asking the court to vacate the Board of Selectmen's decision to award a business permit to the non-municipal defendants

---

6. A "major development" includes (A) projects involving construction, addition or conversion of more than 5,000 square feet of gross floor area; (B) projects involving the construction or installation of more than 5,000 square feet of impervious surfaces; and (C) projects involving the construction or establishment of more than five lots or dwelling units. See DRESDEN, ME. LAND USE AND DEVELOPMENT ORDINANCE, Article VI, § 3. It also includes any project the Planning Board finds needs a major development review in order to protect the health, safety, and welfare of the community, and those projects or uses requiring Site Plan Review under Article VI. See id.

7. The plaintiffs brought a Count II, which was resolved prior to the court's Order for Remand dated May 19, 2000.

(Count III).[8]

After a hearing, this court issued an Order for Remand dated May 19, 2000, which stated, in pertinent part:

1. The Court finds that there is insufficient evidence in the record to demonstrate that the applicants' proposal will meet the applicable ordinance compatibility standards (Art. VI, Section 8, K) with respect to noise.

2. The matter is hereby REMANDED to the Dresden Planning Board for further proceedings in accordance with this ORDER.

3. The Planning Board shall review the noise standards of the Maine Department of Environmental Protection (DEP), shall consider and use those standards that are applicable to the proposed project, and shall explain its reasoning as part of its further decision hereunder. The DEP standards are set forth in chapter 375, part 10, of the DEP regulations under the Site Location and Development Law.

4. The Planning Board shall obtain input and evidence from at least one person who is recognized as an expert in the measurement and analysis of noise. Pursuant to the ordinance (Article VI, Section 4, E), the Board shall select an independent expert to make the appropriate measurements and analysis. The Board shall hear any additional, relevant, non-redundant evidence on the noise issue from the parties or their experts, if any. The input and evidence from the independent expert shall include at least the following:

* any measurements which the independent expert deems necessary to determine whether the proposed project meets the standards determined by the Board to be applicable, including measurements of a realistic simulated operation of the proposed project, with measurements at all appropriate locations (e.g., protected locations), and

* a report from the expert regarding the measurements and whether the proposed project, during normal operation, will meet the applicable standards. The report may include any recommendations as to terms or conditions under which the proposed project would meet

8. The plaintiffs added this count when, on June 28, 1999, the Dresden Board of Selectmen, after conducting a hearing and making several findings pursuant to Section II (C) of the Dresden Business Permit Ordinance, awarded to the non-municipal defendants a new business permit, subject to several conditions.

the standards.

5. The Planning Board shall review all input and evidence regarding noise and shall issue a written decision of its determinations regarding the applicable standards, the noise measurements, and the ability of the proposed project to meet the standards. The Board shall consider whether any additional procedures may be necessary to ensure on-going compliance with noise standards (e.g., regular spot checks of the motorcycles by the applicant/operator for compliance with the EPA noise emission standard for the vehicles, with reports thereof to the Town). The Board shall attach to its written decision all new evidence which it has received as part of the record in this phase of the proceedings. The Board may revise its prior decision in any manner it deems appropriate, given its determinations regarding the noise issue.

* * *

8. The court retains jurisdiction over the matter during the additional review and determinations outlined herein. When the written decision and additions to the record are submitted to the court, the court shall resume its review of the matter and render a decision.

Pursuant to this Order, the Board held a hearing and issued its modified decision on June 19, 2001, in which it found that the speedway would meet the applicable noise standards under certain modified conditions, and upheld its prior decision to allow the construction of the speedway. Subsequently, on May 1, 2001, the plaintiffs filed a motion for leave to file a second supplemental complaint, in which they request permission to add a count alleging failure to comply with the court's Order of Remand (Count IV), and a count alleging that the Board violated the Land Use and Development Ordinance (Count V). Both the non-municipal and municipal defendants oppose the plaintiffs' request.

## DISCUSSION

### 1. Plaintiffs' Motion for Leave to File Second Supplemental Complaint

The plaintiffs are asking the court, pursuant to M.R. Civ. P. 15 (d), to permit them to file a second supplemental Rule 80B complaint setting forth events that have occurred since the filing of their Amended First Supplemental Complaint dated July 15, 1999. Specifically, the plaintiffs allege that the Board's revised decision

5

violated the court's Order of Remand and Dresden's Land Use and Development Ordinance.

Rule 15 (d) of the Maine Rules of Civil Procedure provides that "[u]pon motion of a party the court may, upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." "[T]he rationale underlying M.R. Civ. P. 15 (d) is that a party should not be put to the expense and aggravation of commencing a new lawsuit when events bearing on, arising out of, or relating in some reasonable way to the matters originally pleaded occur after the complaint has been filed." Rancourt v. City of Bangor, 400 A.2d 354, 356 (Me. 1979). "Unless the adverse party can demonstrate that his position will be prejudiced by the allowance of a supplemental pleading, the court will ordinarily grant the motion." Spickler v. Key Bank of Southern Maine, 618 A.2d 204, 206 (Me. 1992) (Law Court upheld trial court's denial of motion to file a second supplemental complaint because the second supplemental complaint contained three new claims, for which additional discovery would be required); Rancourt, 400 A.2d at 356.

Both the non-municipal and municipal defendants essentially argue that allowing the motion would add an unnecessary procedural step to the case and cause substantial delay because the court retained continuing jurisdiction over this appeal, which includes reviewing the work generated as a result of the Remand Order of May 19, 2000.

In support of their motion, the plaintiffs rely on Richardson v. Town of Kittery, 571 A.2d 1201 (Me. 1990), in which the plaintiffs asked the Kittery Board of Zoning Appeals for permission to locate a garage 65 feet from surrounding wetlands. Id. at 1202. When the Board denied the plaintiffs' request, they filed a Rule 80B complaint. Id. While that action was pending, the plaintiffs sought to overcome their difficulty with the town by seeking a building permit for a garage/boathouse in the same location. Id. When the Board denied this second application, the plaintiffs filed a motion to supplement their earlier complaint by

adding a count challenging the second denial. Id. The town consented to, and the court granted, the motion. Two years later, the court determined that the supplemental complaint was not sufficient to maintain jurisdiction over the second decision and that the proper remedy for the plaintiffs was to have filed a separate Rule 80B complaint. Id. On appeal, after finding that the supplemental pleading would cause no prejudice or delay, the Law Court determined that the Superior Court appropriately granted the Rule 15 (d) motion when it was first made. Id. at 1203. The Law Court held that "a second Rule 80B complaint can be properly commenced by filing a supplemental complaint under M.R. Civ. P. 15 (d)." Id. at 1202.

This case is distinguishable from Richardson for two reasons. First, in Richardson, the town consented to the Rule 15 (d) motion. The defendants in this case oppose the plaintiffs' motion. Second, the plaintiffs in Richardson filed their supplemental complaint after the Board denied their second independent application for a building permit. In the case at bar, the plaintiffs filed their supplemental complaint in response to the Board's alleged failure to implement properly the requirements in the Order of Remand on the exact application before the court now. As discussed below, the court's ability to review whether the Board followed the court's own mandate is inherent in the court's maintaining jurisdiction over the case. Richardson, therefore, does not apply here.

"The judgment of the court [in an 80B appeal] may affirm, reverse, or modify the decision under review or may remand the case to the governmental agency for further proceedings." M.R. Civ. P. 80B (c). "When confronted with an inadequate record, the Superior Court has two choices. First, the court may set aside the Board's decision and require a new hearing by the Board. Second, it can remand to the Board for further findings to develop the record within a stated time period, while explicitly retaining jurisdiction in order to demonstrate that the decision is not a final judgment." Sanborn v. Town of Eliot, 425 A.2d 629, 631 (Me. 1981). See Valdastri v. City of Bath, 521 A.2d 691, 692-693 (Me. 1987) ("[w]hen the Superior

Court remands to an administrative board or agency for the purpose of having it take further action reviewable by the Superior Court, the court should retain jurisdiction awaiting the outcome of these further adminstrative board or agency proceedings."). Deviation from a court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review. Sullivan v. Hudson, 490 U.S. 877, 886 (1989). "The Court retains the power in such situations to assure that its prior mandate is effective." Id. See generally Dep't of Human Services v. Monty, 2000 ME 96, ¶ 7, 750 A.2d 1276, 1278 ("[w]e [the Law Court] review whether a trial court has properly construed a mandate of this Court on remand for an error of law."). The court's power to review the Board's revised decision is, therefore, inseparable from its power to remand.

A review of the language the court used in Order would lead to a similar result. In its Order of Remand, the court "retain[ed] jurisdiction over the matter during the additional review and determinations," and said it would "resume its review of the matter" when the Board submitted its written decision and additions to the record. In addition to the rule that review is an inherent part of the court's power to remand, the language used in the Order is broad enough to encompass a review of the Board's modified decision. This review, by implication, includes a review of whether the Board followed the court's mandate. The court stated in the Order of Remand that "when the written decision and additions to the record are submitted to the court, the court shall resume its review of the matter and render a decision." This sentence presumes that the modified decision would become part of the matter over which the court would "resume its review."

The plaintiffs are requesting a Count IV, which would allege the municipal defendants' failure to follow the Order of Remand. This type of review falls under the scope of Count I, a request to vacate the Board's decision to grant the permit to build the raceway. In Count V, the plaintiffs hope to allege that the Board violated the Land Use and Development Ordinance. This type of review also falls under the purview of Count I. In reviewing a municipal board's decision, part of the duty of

8

the court is to ensure that the board applied the ordinance correctly. A review of whether the Board violated the Ordinance, then, is encompassed by Count I. To allow Counts IV and V, whose essential character is included in Count I, would create counts entirely redundant, unnecessary, and time consuming. The plaintiffs' Motion for Leave to File a Second Supplemental Complaint is, therefore, denied.

## 2. Plaintiffs' 80B Appeal

Contrary to the plaintiffs' assertions, the record, and the Board's decision, reveal that the Board thoughtfully and deliberately considered all concerns and requirements, demonstrating its consideration for the health, safety, and welfare of the community. The conditional use permit itself is evidence that the Board balanced all competing interests. The permit contains more than thirteen categories of conditions and limitations for the construction and development of the project. It is evident that the Board tried to fashion a permit around the concerns of those who presented their grievances and concerns. It is important to note that if the non-municipal defendants fail to meet any of the conditions, the town may revoke the permit. See Bushey v. Town of China, 645 A.2d 615 (Me. 1994).

### a. Standard

"The party seeking review of agency action has the burden of proof to show that the decision of the agency is not supported by competent evidence." Greeley v. Comm'r, Dep't of Human Services, 2000 ME 56, ¶ 9, 748 A.2d 472, 474. "The Board's decision is reviewed for an abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." Springborn v. Town of Falmouth, 2001 ME 57, ¶ 8, 769 A.2d 852, 855. The court may not "overturn the factual findings of a board unless they are unsupported by substantial evidence in the record." Bushey v. Town of China, 645 A.2d at 619.

"Interpretation of a zoning ordinance is a question of law" for the court. Lewis v. Town of Rockport, 1998 ME 144, ¶ 8, 710 A.2d 1047, 1049; Oliver v. City of Rockland, 1998 ME 88, ¶ 8, 710 A.2d 905, 908. "A court must interpret an ordinance by first looking at the plain meaning of the language to give effect to legislative

intent." Banks v. Maine RSA #1, 1998 ME 272, ¶ 4, 721 A.2d 655, 657 (citation omitted). "The terms or expressions are construed reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." Oliver, 1998 ME 88, ¶ 8, 710 A.2d 905. "Undefined terms should be given their common and generally accepted meaning unless the context clearly indicates otherwise." Id. Additionally, "an agency's interpretation of a statute or regulation it regularly administers is to be granted great deference and must be upheld unless the regulation plainly compels a contrary result." Wright v. Town of Kennebunkport, 1998 ME 184, ¶ 5, 715 A.2d 162, 164 (citation omitted). An agency's construction, however, "is not conclusive on the Court." Id.

Under the Ordinance, the Board shall approve a conditional use permit if

the proposed use or structure is found to be in conformance with the purposes and provisions of [the] Ordinance. Permits may be made subject to reasonable conditions to insure conformity with the purposes and provisions of this Ordinance, and the permittee shall comply with such conditions.

DRESDEN, ME. LAND USE AND DEVELOPMENT ORDINANCE, Article II, § 4 (B). "The burden of proof that a proposed land use activity is in conformity with the purposes and provisions of this Ordinance lies with the applicant." Id.

### b. Count I: Vacate the Board's Decision

The plaintiffs make two basic arguments in support of their assertion that the court should vacate the Board's decision. First, they argue that the Board's findings of fact and conditions were not based on substantial evidence in the record. Second, they argue that the Board abused its discretion and violated the Land Use and Development Ordinance.

### i. Substantial Evidence in the Record

The plaintiffs first contend that there is insubstantial evidence in the record to support the Board's decision. In order to vacate the Board's decision, the court must be satisfied that the Board's conclusions are not supported by substantial evidence. See Adelman v. Town of Baldwin, 2000 ME 91, ¶ 12, 750 A.2d 577, 583. "Substantial evidence is evidence that a reasonable mind would accept as sufficient

10

to support a conclusion." Sproul v. Town of Boothbay Harbor, 2000 ME 30, ¶ 8, 746 A.2d 360, 372. "The possibility of drawing two inconsistent conclusions from the evidence does not make the evidence insubstantial." Id.

### (a) Noise, Devaluation, and Incompatibility

### (i) Noise

This is the matter for which the court issued its May 2000 Order of Remand, in which the court essentially ordered the Board to:

(1) review the noise standards of the Maine DEP, consider and use the standards applicable to the non-municipal defendants' project, and explain its reasoning;

(2) obtain input and evidence from at least one expert in the measurement and analysis of noise, and hear any additional, relevant, non-redundant evidence on the noise issue from the parties or their experts. The expert's input and evidence was to include at least the following:

(a) measurements the expert deemed necessary to determine whether the project met the applicable standards.
(b) a report from the expert regarding the measurements and whether the project, during normal operation, would meet the applicable standards.

(3) review all input and evidence regarding noise, issue a written decision of its determinations regarding the applicable standards, noise measurements, and the ability of the project to meet the standards, and consider whether additional procedures were necessary to ensure ongoing compliance with noise standards.

In its Decision on Remand from Superior Court, the Board submitted its findings (as discussed below), and modified its decision. The Board placed the following conditions that the non-municipal defendants must meet, and continue to meet:

All motorized competition vehicles using the facility shall have exhaust mufflers that meet the noise emission standards of the United States Environmental Protection Agency and in no case exceed 82 decibels of sound pressure level at 50 feet on the "A" scale, as measured by the SAE standards J-192 (Maine ATV laws, 10/96). ***

11

The Applicants shall construct and maintain suitable earthen berms at the locations and with the heights specified . . . . *** In addition to placing a berm at each specified location, the easterly end of the most easterly berm (located along northeasterly boundary line) shall extend to a point which is on a line running perpendicular to the northeasterly boundary line and intersecting the most easterly point of the track. Each berm shall be constructed, vegetated and maintained in a manner that prevents any erosion or sedimentation. The side slope of each berm shall have a maximum angle of 45 [degrees] (slope ratio of 1:1, or 100%). The top of each berm shall have a minimum horizontal width of 2' (two feet). The specified height of each berm shall be maintained so that it continues to have at least the same relative height above adjoining ground level and above the track.

If the Town, through its Code Enforcement Officer (CEO) or an approved designee, takes sound level readings which indicate probable noncompliance with the maximum sound levels set by this Decision ( i.e., 70 dBA at property lines and 55 dBA at protected properties), then, first, the CEO shall notify the operator who shall have an opportunity to take prompt corrective action. If such action is inadequate, then the Town, in consultation with the operator, shall arrange for a qualified noise analyst to take sound level measurements of actual operations to determine whether they are in compliance with the limits. The expense of such measurements by the noise analyst shall be borne by the operator.

If, at any time in the future, sound level measurements made by the Town, through its Code Enforcement Officer (CEO) or an approved designee, indicate a violation of the maximum sound levels set by this Decision . . . the Town may require appropriate corrective action, including modifications of the berms, so as to ensure compliance with the maximum sound levels allowed. Nothing in these Noise Control provisions shall be construed to limit the Town's normal rights to enforce its ordinances, pursuant to the terms thereof and pursuant to state law.

The Dresden CEO, or his designee, may take noise level readings at various locations on the site during any permitted activity. Noise measurements shall be taken with a sound-level meter meeting the standards of the American National Standards Institute, ANSI S1.2-1962 *American Standards Meter for the Physical Measurement of Sound.*

All loud speakers shall be mounted no higher than twelve (12) feet above ground level and shall be oriented downward and inward towards the track. No loudspeakers shall be pointed in the direction of any abutting residential area. Loudspeaker volume shall be kept as low as possible and will be subject to the same overall limits on noise set forth above for protected locations and

12

property lines.

As discussed below, there is substantial evidence demonstrating that the raceway, with the above-quoted conditions, will meet the standards in the Department of Environmental Protection regulations. First, the Board is requiring each bike to have exhaust mufflers, such that no bike can exceed 82 decibels at a distance of 50 feet. Second, the raceway is required to place earthen berms at several locations around the pit. Third, the raceway is required to erect buffers and trees to keep the decibel levels at the level specified. Fourth, the town CEO can come in at any time and conduct sound level measurements to ensure the raceway sound levels are remaining within the designated limits. If they are not, and do not remedy the problem, the town may revoke the conditional use permit. See Bushey v. Town of China, 645 A.2d 615, 617 (Me. 1994).

## A. Hourly Sound Level Limits

"[T]he hourly sound levels resulting from routine operation of the development . . . shall not exceed the following limits: (i) at any property line of the development . . .: 75 dBA at any time of day; (ii) at any protection location[9] in an area for which the zoning . . . is not predominantly commercial, transportation, or industrial:[10] 60 dBA[11] between 7:00 a.m. and 7:00 p.m."[12] Code Me. R. 06-096 Ch. 375,

---

9. A protected location is defined as "[a]ny location, accessible by foot, on a parcel of land containing a residence or planned residence or approved residential subdivision . . . near the development site at the time a Site Location of Development application is submitted." Code Me. R. 06-096 Ch. 375, § 10 (G)(16).

10. The parties agree that the disputed area is not predominantly commercial, transportation, or industrial.

11. However, "[w]hen a proposed development is to be located in an area where the daytime pre-development ambient hourly sound level at a protected location is equal to or less than 45 dBA . . . the hourly sound levels resulting from routine operation of the development . . . shall not exceed the following limits at that protected location: 55 dBA between 7:00 a.m. and 7:00 p.m. . . . ." Code Me. R. 06-096 Ch. 375, § 10 (C)(1)(a)(v). In order to determine whether a protected location has a daytime pre-development ambient hourly sound level equal to or less than 45 dBA, the developer may

make sound level measurements in accordance with the procedures in subsection H or estimate

13

§ 10 (C)(1)(a)(i) and (ii). These sound levels are to be measured in accordance with the measurement procedures described in subsection H of the regulation. Id. at section 10 (C)(1)(a).

The Board set the average hourly sound level limits for the Dresden Motocross Raceway at 70 dBA at any property line, and 55 dBA at any protected location.[13] There is substantial evidence in the record to support this conclusion.

---

the sound-level based upon the population density and proximity to local highways. If the resident population within a circle of 3,000 feet radius around a protected location is greater than 300 persons, or the hourly sound level from highway traffic at a protected location is predicted to be greater than 45 dBA in the daytime . . . then the developer may estimate the daytime . . . pre-development ambient hourly sound level to be greater than 45 dBA . . . .

Code Me. R. 06-096 Ch. 375, § 10 (C)(1)(a)(v). The Board interpreted this provision to mean that there are two ways to determine whether the protected location has a daytime pre-development ambient hourly sound level equal to or less than 45 dBA, and that persons who choose the second option may make their measurements in accordance with the sentence immediately following the second option. A review of the plain language of section 10 (C)(1)(a)(v) demonstrates that the Board's interpretation is correct.

The disjunctive "or" used between the two phrases in the regulation indicates the DEP's intention to require either the first option or the second option in measuring pre-development ambient sound levels in protected locations. Those who choose the second option may utilize the method described in the last sentence of the paragraph. This is indicated by this language immediately following the second option: "then the developer may estimate the daytime . . . pre-development ambient hourly sound level to be greater than . . . ." The inclusion of the word "estimate" demonstrates DEP's intent that this method be employed by those choosing the second option. On the other hand, those who choose the first option must use those methods described in Subsection H, as specifically stated in the regulation.

Because the Board's interpretation is correct, the fact that Jim Cowan, the Board's expert, chose the second option is in accordance with the regulations. His expert opinion was that by using the methods described in the second option, the sound levels exceeded 45 dBA, and, therefore, the sound level limits under section 10 (C)(1)(a)(v) do not apply to the motocross.

12. The Board made no findings for nighttime hourly sound levels because "this operation would be between the hours of 7:00 a.m. and 7:00 p.m., and is therefore a daytime activity." Decision on Remand from Superior Court, p. 3 n.2.

13. These final sound level limits are set five decibels lower than the maximum stated in section 10 (c)(1)(a)(i) and (ii) because of the "short duration repetitive sounds" penalty that the Board determined was necessary to apply to the raceway. See infra Section (C)(b)(i)(a)(c), entitled "Short Duration Repetitive Sounds."

14

## B. Tonal Sound

In order to determine compliance with the sound level limits cited above, "5 dBA shall be added to the observed levels of any tonal sounds[14] that result from routine operation of the development." Code Me. R. 06-096 Ch. 375, § 10 (C)(1)(d). According to the Board:

> Jim Cowan of Acentech states . . . that he did not detect or observe any 'tonal sounds' from the simulated race activities. Charlie Wallace, the consultant hired by [the plaintiffs], questioned this conclusion on the basis of his measurements of sound recordings on the videotapes (provided to him by the [plaintiffs]) of the simulated race activities and of the Skowhegan race which was previously recorded by the [plaintiffs]. . . . Jim Cowan questioned and disputed the validity of such measurements taken from pre-recorded sounds.

> The Board concludes that the preponderance of credible evidence indicates there are no tonal sounds, so that basis for a separate lower sound level limit does not apply.

This is a classic case of credibility. Faced with two different opinions from two seemingly qualified experts, the Board found Cowan's opinion based on on-site sound measurements more credible, as Wallace based his opinion only on pre-recorded race activities, a review of documents, and computer modeling. The Court cannot substitute its judgment for that of the Board, and must affirm the Board's findings of fact if they are supported by substantial evidence in the record. Gulf Island v. Board of Environmental Protection, 644 A.2d 1055, 1059 (Me. 1994). The Board was entitled to determine whose opinion it would adopt and there is substantial evidence to support its choice. Cowan actually went to the site and measured the sound levels of actual motor bikes. Using his on-site measurements, he determined that no tonal sounds existed. Wallace, on the other hand, made his conclusions by watching videotapes of races and reviewing documents. The Board's

---

14. A tonal sound exists if "at a protected location, the one-third octave band sound pressure level in the band containing the tonal sound execeeds the arithmetic average of the sound pressure levels of the two contiguous one-third octave bands by 5 dB for center frequencies at or between 500 Hz, by 8 dB for center frequencies at or between 160 and 400 Hz, and by 15 dB for center frequencies at or between 25 Hz and 125 Hz." Code Me. R. 06-096 Ch. 375, § 10 (G)(24).

15

decision to go with Cowan's opinion is certainly supported by the likelihood that Cowan's opinion was based on more credible and reliable evidence. There is substantial evidence supporting the Board's determination.

## C. Short Duration Repetitive Sounds
### ("SDRS")

Under section 10 (C)(1)(e),

[w]hen routine operation of a development produces [SDRS], the following limits shall apply:

(i) For [SDRS], 5 dBA shall be added to the observed levels of the [SDRS] that result from routine operation of the development for the purposes of determining compliance with the above sound level limits.

Code Me. R. 06-096 Ch. 375, § 10 (C)(1)(e)(i). SDRS are defined in the regulations as:

A sequence of repetitive sounds which occur more than once within an hour, each clearly discernible as an event and causing an increase in the sound level of at least 6 dBA on the fast meter reponse above the sound level observed immediately before and after the event, each typically less than ten seconds in duration, and which are inherent to the process or operation of the development and are foreseeable.

Code Me. R. 06-096 Ch. 375, § 10 (G)(19). While the plaintiffs contend that Cowan did not provide any objective recorded measurement data to determine the presence of SDRS, this argument is moot because the Board assumed in its modified decision that there would be SDRS. After examining the regulation regarding SDRS, an opinion by the DEP pertaining to the possible presence of SDRS at motocross races, and Cowan's and Wallace's opinions, the Board concluded:

[w]hile the provision of this definition . . . leaves significant room for interpretation, and while it appears that the development in question will not produce so-called impulsive sounds which are usually the subject of this type of regulation, to err on the side of caution, the Board concludes that, under this rather loose definition of SDRS, there could be SDR[S] from routine operations of the development. In such circumstances, the regulations provide that 5 dBA are added to the 'observed levels' (projected levels). This effectively lowers the allowed limit by 5 dBA, so that the **final applicable limits** are established at **70 dBA at any** <u>property line</u> **and 55 dBA at any** <u>protected location.</u>

16

(emphasis original).

### (ii) Devaluation

The plaintiffs argue that the non-municipal defendants provided no evidence that the detrimental effects of the speedway on the value of the abutters' properties will be minimized, as required by Article VI, § 8 (K)(4), which provides that:

> [i]n approving site plans and subdivisions with the Town of Dresden the Planning Board . . . before granting approval shall make findings of fact that . . . [t]he proposed activity will minimize any detrimental effects on the value of adjacent properties.

DRESDEN, ME., TOWN OF DRESDEN LAND USE AND DEVELOPMENT ORDINANCE, Article VI, § 8 (K)(4).

The plaintiffs argue that the only document considered by the Board is a one-page letter from Court Realty, which, according to the plaintiffs, is so heavily qualified that it provides no opinion whatsoever. In the letter, Ed Jurenas, a realtor, opined:

> that a racing track such as the one you propose, and for which comparable race tracks exist elsewhere in Maine and throughout the country, does not inherently present a positive or negative impact on real estate values. It is in the execution of the activity on a particular parcel of land, not the concept of the activity, which may either add or subtract to anticipated real estate values in a given area.
>
> Will the park be operated in a professional manner, with landscaped grounds, reasonable hours of operation, adequate traffic and sound controls, and strict codes of behavior for participants and visitors alike? Or will the operation be tawdry and unkempt? Virtually any recreational activity can be either a valuable community and family fun resource, or it can be a detriment to the safety and property values of a neighborhood. Most of it is in the execution of the plan.

The Board listened to Defendant Scott Connors, who stated at the March 2, 1999 hearing that he spoke "to six different realtors and they're mostly concerned is [sic] how [the non-municipal defendants are] going to handle it. Their personal reason is if we handle it wrong, have garbage all over the place, it's going to depreciate. What

17

our plan is is make it nice landscape, keep it grass, keep a nice uplook."

The Board also heard Richard Main, a concerned citizen, who spoke at the April 6, 1999 hearing. He stated:

> It's been noted that valuations have dropped near Wiscasset Raceway. One house in particular was on the market for $129,000 that sold for $83,000. Similar kinds of valuation drops have occurred in Pittston near the fairgrounds; and Pittston, if you are not aware, has had a lot of difficulty with the fairgrounds and the use of the fairgrounds and they have been trying to do -- they are attempting to control the problems that they now have.

Also included in the record is a letter dated March 14, 1999 from Julie Cromwell, a real estate broker, who opined about the possible depreciation of the Gagne's mobile home park:

> Presently, the mobile home park can attribute its excellent rental status to the area that surrounds it, the quiet country living and the reasonable monthly rent payments. *** Currently, five mobiles are rented with a yearly gross income of $25,560. Futuristically the potential is there to reach a yearly income of $153,000 considering that the environment remains the same in the immediate area.
>
> However, if something were to disrupt the tranquil surrounding area, such as a motor-cross raceway, then it is almost guaranteed that tenants may be harder to find and the turnover more frequent due to people finding the noise to be more than they can bear thus breaking lease. After review of the Motor-Cross Applications/Proposals and inspection of the mobile home park property there proved to be no natural wooded buffer in between the two lots which would aid in sheilding [sic]/protecting the tenants. Noise, dust and people are almost sure to invade [] the mobile park tenant's existence if this were to happen .... In terms of marketing this property at it's [sic] present state or at it's [sic] full, 23 lot, potential it would be difficult to obtain it's [sic] top market value with something of this nature so close by.

Ms. Cromwell also provided an opinion for the McPhetres property:

> The above market value opinion [$91,000 to $96,000] is based on the surroundings remaining as they are presently. If there were to be a drastic change in the local community affecting the level of vehicular traffic, people and noise as the proposed motor-cross raceway may cause it will definitely effect [sic] the saleability of this, and any for that matter, home with respect to

the top price in the shortest time.

"Depreciation, like the market value of property [can] not be proved with mathematical certainty and must ultimately rest in the realm of opinion, estimate, and judgment." Kittery Electric Light Co. v. Assessors of Town, 218 A.2d 728, 738 (Me. 1966). The Board had two credible opinions with differing views on whether the value of the property would decline. The weight of expert testimony is solely for the finder of facts who may fairly come to the conclusion that none of it, or a part only, is entitled to weight, and this is especially so where market values of property are involved. Id. at 743.

While it is true that the Board may have believed that the raceway itself may have a detrimental effect on the value of the surrounding properties, it determined that with the conditions the raceway would not have any detrimental effect.[15] This conclusion is supported by substantial evidence. The Board included in the permit the following conditions (1) the facility may be used during limited hours on limited days, (2) the raceway is responsible for maintaining cleanliness around the facility, (3) the raceway must have tree and fence buffering along its perimeter, (4) there must be caution signs along Route 27, (5) the raceway must implement specific noise and dust control measures, and (6) the raceway must provide security and emergency medical personnel for each day of operation. The Board also made it clear that it would encourage the raceway to implement a procedure for responding to and resolving neighborhood concerns in a fair and reasonable manner. In making its decision, the Board heard at length the concerns of citizens. The Board answered each of those concerns by imposing requirements addressing each of the problems created by the raceway's operation. There is substantial evidence in the record supporting the Board's decision on this matter.

---

15. The plaintiffs claim that the Board placed the burden on the abutting landowners, not the applicants. They cite several examples from the record. Each of those examples are isolated incidents, and are instances where the Board members should have used more appropriate language. Overall, however, it does not appear as though the Board shifted the burden of proof to the plaintiffs.

19

## (iii) Compatibility

The plaintiffs argue that the Board did not have substantial evidence demonstrating that the raceway is compatible with existing uses on surrounding properties. "In the interpretation and enforcement of this Ordinance, all words, other than those specifically defined in the Ordinance, shall have their ordinarily accepted meaning." DRESDEN, ME. LAND USE AND DEVELOPMENT ORDINANCE, Appendix A, § 1. The term "compatible" is not defined in the Ordinance. It is necessary, therefore, to look at the term's ordinarily accepted meaning. "Compatible" means "capable of living or performing in harmonious, agreeable, or friendly association with another or others." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 290 (1988).

> In its decision, the Board found that:
>
> [t]he proposed activity is sited in an abandoned gravel pit adjacent to State Route 27 in the General Use District. The General Use District includes those areas of the Town that are the most environmentally suitable and practical to accommodate future growth and development within the community. The General Use District is intended for a mix of residential and non-residential uses that are compatible with existing surrounding uses and natural resources and are along established roadways.
>
> Abutting uses are a commercial mobile home park, a horse training facility, a golf practice range, undeveloped woodland and three single family residences. The applicants have proposed no permanent structures for the site, much of which is in a 10 to 15 foot depression created by the removal of gravel.
>
> The board is requiring buffers and screening of the proposed use from adjacent properties and Rt. 27, establishing noise level limits and dust control measures for the project and limiting the proposed use to 22 days in a calendar year. The applicants are required to place warning signs on Rt. 27 to alert motorists to turning traffic.
>
> The board finds that the conditions required of the applicants will:
>
> 1) make the proposed activity compatible with and sensitive to the character of the site and neighborhood,
> 2) maximize the opportunity for privacy by the residents in the immediate area,

20

3) ensure safe and healthful conditions within the neighborhood, and
4) minimize any detrimental effects on the value of adjacent properties.

The record makes it very clear that Board took this issue seriously, as it received many comments and letters from concerned citizens about this project. The Board placed numerous conditions on the project in order to minimize any visual and/or acoustical impacts to adjoining properties. There is substantial evidence in the record to support the Board's assertion that the raceway, with the imposed conditions, would be compatible with its surrounding neighborhood.

### (b) Traffic Impact and Parking

Under Article VI, § 7 (F)(7) of the Ordinance, applications for major developments must include "a traffic impact analysis demonstrating the impact of the proposed project on the capacity, level of service and safety of adjacent streets." According to the plaintiffs, the non-municipal defendants did not submit a traffic analysis, but only submitted assorted raw data compiled by the Department of Transportation for its own purposes relating to accidents and traffic volume on certain days on a portion of Route 27. The plaintiffs argue that the non-municipal defendants had to provide evidence that their proposed activity would not cause unreasonable highway or public road congestion or unsafe conditions with respect to the use of the highways, pursuant to Article VI, § 8 (R) of the Ordinance. Furthermore, the plaintiffs contend that the non-municipal defendants did not base their assumptions as to the number of participants and spectators that are likely to attend these weekend events during the summer months.

In addition to the Department of Transportation, the non-municipal defendants submitted a letter regarding the Wiscasset Speedway from the Chief of the Wiscasset Police Department. In his letter the Chief stated:

> On a good weekend, there can be as many as 200 vehicles at the raceway, and depending [on] the time of the year, some of the races are held at night.

> Even with this increase in traffic, we have not seen any major increase in our accidents in the area. The only problem we have experienced in the area is occasional reports of speeding vehicles on one of the roads in the area.

After considering all the evidence before it, the Board found that:

> [t]he facility is located adjacent to Route 27 and access to the site is from Route 27. The site is limited to 170 parking spaces for spectators. Weekday traffic is primarily commuter traffic peaking in the morning and evening. The track will operate primarily on Sundays. Weekend traffic data was not available from MDOT.

> The track participants and spectators are expected to arrive and depart the site at different times because of the way in which the applicants schedule the racing classes. The board is requiring that: (1) uniformed personnel to be present anytime the track is operating for traffic control; (2) that the applicants place warning signs on Route 27 north and south of the entrance when operating; and (3) that entering vehicles pull completely into the site well off Route 27 before stopping.

Thereafter, in the conditional use permit, the Board required the non-municipal defendants to do several things regarding traffic:

> Traffic warning signs with the words 'Caution Turning Traffic' of a size and color approved by the CEO shall be placed on the shoulder of Route 27 at least one thousand (1,000) feet north and south of the track entrance road during all hours that the track is in operation. These signs shall not be placed within one hundred (100) feet of any driveway.

> A law enforcement officer or uniformed security officer shall be present at all times that track activities are open to the public to provide security and traffic control for the first season of operation. At the end of the first season of operation, upon review and recommendation of the CEO, the Planning Board may waive this requirement for one or more subsequent seasons, and thereafter, if deemed necessary, may reimpose this requirement. Vehicles entering the track shall be allowed to proceed to the easterly end of the access road before they are required to stop for entrance fee payments.

The Board also limited any traffic problems by restricting the parking to 170 spaces, and, therefore, the amount of vehicles allowed into the facility.

While there is a sharp disagreement between the plaintiffs and the non-municipal defendants over the traffic issue, there is substantial evidence in the record to support the Board's conclusion that the project with the conditions imposed upon the raceway would not create significant traffic problems in the area.

22

First, the raceway is limited to only 22 operating days per calendar year. Secondly, the staggering of races suggests that there will not be a huge influx of spectators all at the same time. The numbers of spectators and participants will be spread throughout the day. Third, the limited amount of parking will limit the number of spectators. Fourth, the Board is requiring that entering vehicles pull completely into the site well off Route 27 before stopping. Fifth, the Board is requiring uniformed personnel be present on all operating days for traffic control. Sixth, the Board is requiring the raceway place signs 1000 feet north and south of the entrance warning of possible traffic. Seventh, the Board banned parking along Route 27. There was substantial evidence in the record to support the Board's decision.

## (c) Off-Street Parking and Loading; Street Access

The plaintiffs argue that the Board did not adequately make provisions for, and the non-municipal defendants did not adequately present, parking for the participants. Article VI, § 7 (E)(3) requires the non-municipal defendants to show the location and dimensions of the proposed parking and loading areas for participants. The non-municipal defendants submitted several maps showing the location and dimensions of the proposed participant parking areas. As the plaintiffs stated in their brief, there are three such areas -- one in the northwest corner that measures 150' x 200', a second in the southeast corner measuring 130' x 100', and a third that measures 50' x 500' fronting the length of the southern boundary of the actual pit. The language in the ordinance requires nothing more than the location and dimensions, both of which are included in the maps. The non-municipal defendants, therefore, met the requirements of the ordinance. Moreover, the conditional use permit contains a requirement that the raceway conform all parking areas and driveways to all applicable provisions of Article IV, § 4 (L).

## (d) Buffers and Screening

The plaintiffs assert that there is not sufficient evidence in the record that the wooden fence and conifer tree buffers will mitigate noise generated at the site. They assert that the wooden fence may actually have a detrimental effect in that it may

23

actually reflect higher frequency noises. In its conditions of approval, the Board required the non-municipal defendants to

> provide buffering along the perimeter of the project boundary beginning at the northeast corner of the project area and running southwesterly to Route 27, then southeasterly along Route 27 following the project boundary to the access road to the project. A 30 foot unvegetated opening for vehicle access is permitted to accommodate the access road. The vegetated buffer on both sides of the access road may be angled away from Rt. 27 towards the parking area to improve visibility of exiting traffic. Beginning on the southerly side of the 30 foot opening for the access road the buffering shall then continue southeasterly along the project boundary and elevated knoll of land a distance of approximately 1000 feet to the existing wooded area along the southeast boundary.

> The buffer shall be planted with white pine or other suitable, native conifer species approved by the Planning Board. All trees shall be a minimum of five (5) feet in height and shall be planted in two (2) staggered rows fifteen (15) feet apart . . . . To insure optimum survival[,] trees shall be planted and maintained according to the guidelines contained in *Planting Trees for Communities-Checklists for [S]uccess* by Reynolds and Ossenbruggen, 1993 . . . .[16] All trees shall remain for the duration of the permitted motocross business. Trees which die shall be replaced by the applicant as soon as possible and no later then the beginning of the growing season following their death. The remaining 35 feet of the required 50 foot vegetative buffer shall be maintained as grass or other natural vegetation. No activity shall be allowed within the buffer area except maintenance activities.

> A permanent fence shall be erected on the track side of the fifty (50) [foot] buffer along the Route 27 frontage of the project. The fence shall be constructed of wood or other suitable material. The top of the fence shall be six (6) feet above the level of Route 27 and shall be maintained as long as the facility is in operation.

In reaching this decision, the Board hired a tree expert, who reviewed the proposed project plan and found no major problems with the buffer/screening tree plan. Those problems he did find, the Board remedied. The plaintiffs have submitted no evidence to contradict the Board's findings that the trees and fence would be adequate buffers, and have failed to demonstrate that the Board's decision

---

16. This instruction book was not submitted as part of the record.

was not supported by sufficient evidence.

### (e) Air Emissions; Pollution

Article V, § 4 (B) of the Ordinance provides that

[n]o use, regardless of size, shall cause or involve emissions of dust, ash, smoke, or other particulate matters of gasses or chemicals which exceed the standards set by the Maine Department of Environmental Protection.

The non-municipal defendants stated in their application that the soil on the site is highly permeable, and that most of the scheduled races will be in the summer months. The Board included in the permit a condition that "[d]uring any permitted activity dust shall be controlled on the track, access road and parking lots by the use of water or other dust control agents such as calcium chloride." The Board found that this condition would ensure that the activities "will not cause undue . . . air pollution." The plaintiffs argue that these conditions are not sufficient.

At this point in time, it is not possible to predict exactly how much dust the raceway will produce when in full operation. By including a requirement that the "dust shall be controlled," the Board left the how and when up to the non-municipal defendants. There is, however, no room for the non-municipal defendants to not meet this requirement. The record indicates that the Board spent quite a bit of time on this issue and determined that water or other dust control agents would significantly minimize any dust problem. There is substantial evidence in the record to support the Board's conclusion that the non-municipal defendants can, and must, control any dust problems.

### (f) Financial Capacity

Article VI, § 7 (F)(14) requires that the application for a conditional use permit include:

[c]ost estimates of the proposed development and evidence of financial capacity to complete it. This evidence should include a letter from a bank, or other source of financing, indicating the name of the project, amount of financing proposed, and the means of financing the project.

Moreover, under the criteria for review and approval under Article VI, § 8 (E)(1):

25

The applicant shall have adequate financial resources to construct the proposed improvements and meet the criteria of the statute and the standards of these regulations. In making the above determinations, the Planning Board shall consider the proposed time frame for construction and the effects of inflation.

The plaintiffs argue that the Board did not have substantial evidence before it to find that the non-municipal defendants met this criteria.

In its findings the Board stated that "[s]ince there would be no liability to the Town whether the project were completed or not the board waived the financial capacity requirement." The Board heard evidence that the project is not going to require huge expense and that the members could meet the financial and technical demands. In addition, the raceway does not involve development or construction in connection with the infrastructure of municipal services. Furthermore, the Ordinance requires only that the non-municipal defendants demonstrate a financial ability to construct and complete the project. It does not require proof that the non-municipal defendants are able to meet the operating costs. The town need only know the non-municipal defendants can meet the conditions stated in the Ordinance. Whether or not the non-municipal defendants can survive as a business is not the town's problem; the Board is not a financial consultant or adviser and it has no expertise in that area. There is substantial evidence in the record to support the Board's decision to waive the financial capacity requirement.

### (g) Site Inventory and Environmental Assessment

Article VI, § 4 (B) requires:

For major development activities, applications for Site Plan Review shall not be submitted until a Site Inventory and Environmental Assessment is first submitted to the Code Enforcement Officer and reviewed by the Planning Board. The Planning Board shall act on the completeness of the Site Inventory and Environmental Assessment within thirty (30) days of its receipt.

The Planning Board may waive specific application requirements when an applicant can show that such requirements are not relevant to the proposed project.

26

The plaintiffs argue that the Board allowed the non-municipal defendants to submit its Site Inventory and Environmental Assessment as part of the amended permit application itself, which is contrary to the requirements in the Ordinance. The Ordinance allows the Board to have the discretion to waive any of the requirements. Here, the Board waived this requirement because the material and information that would normally be included as part of the Site Inventory and Environmental Assessment was not developed and presented until after the point in the application process when the Board determined that the raceway should be considered a major development. The review and comment stage of the application pursuant to Article VI, §§ 5 and 6, did occur during the review process, and it occurred prior to the Board considering the applicants amended permit application dated February 16, 1999.

"The Site Inventory and Environmental Assessment . . . is intended to provide both the applicant and the Planning Board with an understanding of the site and surroundings, and the opportunities of and constraints on the proposed use of the site." DRESDEN, ME. LAND USE AND DEVELOPMENT ORDINANCE, Article VI, § 5 (A). The entire purpose of the assessment is to give the Board and applicants an opportunity to discover the issues for the particular site and what items need to be addressed. Although the non-municipal defendants submitted the Site Inventory and Environmental Assessment after they submitted the application for a minor development, the purpose behind submitting the assessment was met. The non-municipal defendants submitted the Site Inventory and Environmental Assessment before its application for a major development and before several of the public hearings. The purpose of the Site Inventory and Environmental Assessment was not compromised, and the Board committed no error.

### ii. Abuse of Discretion

The plaintiffs also assert that the Planning Board abused its discretion and violated the Land Use and Development Ordinance. First, they argue that the Board erred by waiving the 2 to 5 foot contour interval requirement under Article VI, § 5

27

(B)(3)(c), which states that an applicant must submit an accurate plan of the parcel showing "the topography of the site at *an appropriate contour interval* (2' to 5') depending on the proposed use of the character of the site." (emphasis added). The Board has interpreted this provision to mean that 2 to 5 feet is generally the scale, but it depends on the site. Contrary to what the plaintiffs argue, the contour was not required to be 2 to 5 feet, and it was within the Board's discretion to determine the appropriate contour interval.

Second, the plaintiffs argue that the Board erred by waiving the requirement to provide cost estimates of the proposed development and evidence of financial capacity to complete it, under Article VI, § 7 (F)(14). Section 7 allows the Board to modify or waive this requirement if it "determines that because of the size of the project or circumstances of the site such requirement(s) would not be applicable or would be an unnecessary burden upon the applicant and would not adversely affect the abutting landowners or the health, safety, and welfare of the Town." The Board found that whether or not the project was completed would not impose a financial liability to the town, so it waived the requirement. The Board had sufficient evidence to support the waiver of this requirement.

Third, the plaintiffs argue that the Board erred by waiving proof of financial and technical ability to meet the criteria and standards as required under Article VI, § 8 (E). As discussed earlier, the Board had sufficient evidence to waive proof of financial and technical ability.

### c. Count III -- Award of Business Permit

The plaintiffs argue that the court should vacate the Board of Selectmen's approval of a business permit for the non-municipal defendants. Section 2 (c) of the Dresden New Business License Ordinance states:

> The Selectmen shall grant a permit if they find that the proposed new business or change therein will not:
>
> (1) cause a disturbance of the peace;
> (2) cause parking problems or hazardous traffic conditions;
> (3) cause an undue reduction in prime farmland;

28

(4) cause an undue burden on the ability of the town to provide adequate municipal services;

(5) cause undue air or water (including ground water) pollution, noise, odors exposure to radiation, waste disposal problems or other unhealthy conditions;

(6) have an undue adverse effect on adjacent land uses and property values, taking into account the character of the affected area, including historic, scenic, aesthetic, and environmental values; or

(7) otherwise constitute a nuisance to local residents or the town.

The Selectmen shall deny a permit if it finds that the proposal does not meet these standards. The Selectmen may grant a conditional permit, containing certain conditions which will ensure that the proposal will meet these standards.

In its findings dated June 14, 1999, the Dresden Board of Selectmen found

1. Disturbance of the Peace: Considering all of the evidence, and considering an implicit standard of reasonableness within the concept of 'disturbance of the peace,' we find that the proposal to run the facility for 22 days in the six month season during the calendar year, if spread out to one day on each of 22 weekends during the May-October season, would create a disturbance of the peace within the intent of this ordinance provision. Therefore, as a condition of approval, the facility may be operated on no more than 11 weekends in any calendar year, and no more than two days per weekend, whether the weekend is a two or three day weekend.

2. Parking And Traffic Conditions: The proposal will not cause parking problems or hazardous traffic conditions . . . .

3. Prime Farmland: The proposal will not cause an undue reduction in prime farmland.

4. Municipal Services: The proposal will not cause an undue burden on the ability of the Town to provide adequate municipal services . . . .

5. Air & Water Pollution, etc.: The proposal, as limited by the Planning Board conditions, will not cause undue air or water pollution (including groundwater). The proposal will not cause an undue exposure to radiation. The proposal will not cause undue waste disposal problems. The proposal will not cause undue odors.

We find that the proposal to run the facility for 22 days in the six month season during any calendar year, if spread out to one day on each of 22

weekends during the May-October season, would create undue unhealthy conditions. Therefore, as a condition of approval, the facility may be operated on no more than 11 weekends in any calendar year, and no more than two days per weekend, whether the weekend is a two or three day weekend.

6. Adverse Effect: The proposal to run the facility for 22 days in the six month season during any calendar year, if spread out to one day on each of 22 weekends during the May-October season, would create an undue adverse effect on adjacent land uses and property values. Therefore, as a condition of approval, the facility may be operated on no more than 11 weekends in any calendar year, and no more than two days per weekend, whether the weekend is a two or three day weekend.

7. Nuisance: The proposal to run the facility for 22 days in any calendar year, if spread out to one day on each of 22 weekends during the May-October season, would create a nuisance. Therefore, as a condition of approval, the facility may be oeprated on no more than 11 weekends in any calendar year, and no more than two days per weekend, whether the weekend is a two or three day weekend.

Considering all of the evidence and given the above findings and conclusions, the application for a new business permit ordinance is approved SUBJECT TO the following CONDITIONS:

1. The facility may be operated on no more than 11 weekends in any calendar year, and no more than two days per weekend, whether the weekend is a two or three day weekend.

2. The applicant must comply with all pertinent state and federal laws, and must obtain any other necessary permits under those laws, including any necessary approval from the Maine Department of Environmental Protection.

The plaintiffs assert that despite the fact that the Board found that the project, as approved by the Planning Board, would create a disturbance of the peace, create undue unhealthy conditions, create an undue adverse effect on adjacent land values, and create a nuisance, it granted the new business permit with a condition to conduct its business with the condition that the twenty-two operating days per calendar year occur within eleven 2-day weekends during a calendar year. According to the plaintiffs, this condition does not eliminate the nuisance, the

30

undue noise, disturbance of the peace, undue adverse effect on adjacent property values, or undue unhealthy conditions. To the contrary, there is adequate evidence in the record to demonstrate that the conditions placed on the raceway's business permit eliminates the nuisance, noise, disturbance of the peace, adverse effects on adjacent property values, and unhealthy conditions. The Board of Selectmen's act of restricting the raceway activities to only eleven weekends per year, allowed for fifteen out of twenty-six summer weekends which would be free of any project activities. It was reasonable for the Board of Selectmen to decide that a certain level of project activity, if limited in frequency, would meet the Ordinance standards. The Board of Selectmen's decision was, therefore, within the bounds of their discretion under the Ordinance.

THE DOCKET ENTRY IS:

The plaintiffs' Motion for Leave to File a Second Supplemental Complaint is denied. The Town of Dresden Planning Board's decision granting the conditional use permit is affirmed. The Town of Dresden Board of Selectmen's decision granting the business permit is affirmed.

_____
JUSTICE, SUPERIOR COURT

DATED: January 3 , 2002

31